**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

ENTERED
07/24/2013

| | | |
|---|---|---|
| **IN RE:** | § | |
| **ATP OIL & GAS CORPORATION** | § | **CASE NO: 12-36187** |
| Debtor(s) | § | |
| | § | **CHAPTER  11** |
| | § | |
| **DIAMOND OFFSHORE COMPANY** | § | |
| Plaintiff(s) | § | |
| | § | |
| **VS.** | § | **ADVERSARY NO. 12-03425** |
| | § | |
| **ATP OIL & GAS CORPORATION** | § | |
| Defendant(s) | § | |
| | § | |
| **TM ENERGY HOLDINGS LLC, GMZ** | § | |
| **ENERGY HOLDINGS LLC, AND CLP** | § | |
| **ENERGY LLC** | § | |
| Plaintiff(s) | § | |
| | § | |
| **VS.** | § | **ADVERSARY NO. 12-03429** |
| | § | |
| **ATP OIL & GAS CORPORATION, et al** | § | |
| Defendant(s) | § | |

**MEMORANDUM OPINION**

Diamond Offshore's Motion for Summary Judgment, (Case No. 12-3425, ECF No. 144),
is denied.  The Court's Order concerning Diamond Offshore's motion for a protective order,
(Case No. 12-3425, ECF No. 120), will be modified by a separate Order in accordance with this
Memorandum Opinion.

TM's Second Motion for Summary Judgment, (Case No. 12-3429, ECF No. 150), is
denied.[1]  TM's Motion to Exclude Evidence, (Case No. 12-3429, ECF No. 105), is denied.

---

[1] The TM adversary proceeding (Case No. 12-3429) involves three separate plaintiffs: (i) TM Energy Holdings
LLC; (ii) GMZ Energy Holdings LLC; and, (iii) CLP Energy LLC. When referencing the plaintiffs generally in this
adversary proceeding, the Court will refer to "TM" for simplicity.

## Background

The motions for summary judgment considered in this Memorandum Opinion relate to whether prepetition transactions between ATP (the debtor in the related main bankruptcy case) and TM and Diamond constitute real property conveyances (as they are characterized in the respective documents) or should be recharacterized as debt instruments.

The individual characteristics of these transactions differ, sometimes greatly, and therefore the ultimate outcomes may vary.

This Court's statements at an April 22, 2013 hearing precipitated these motions for summary judgment. Some prior history is necessary to place these motions in their proper context.

### I.   Prior Rulings in the Diamond Adversary Proceeding

Discovery had not been completed in the Diamond adversary proceeding prior to the April 22 hearing. Motions related to discovery disputes were addressed at multiple hearings held in March and April 2013.

#### a.   March 21, 2013 Hearing

Diamond's Motion for a Protective Order, (Case No. 12-3425, ECF No. 89), was discussed at the March 21, 2013 hearing. Diamond sought to prevent ATP from discovering extrinsic evidence related to these transactions, believing the evidence is inadmissible in this adversary proceeding.

At the hearing, the Court made a ruling as to what extrinsic evidence may be considered (and would be discoverable):

> The Court has reviewed the various transactional documents that are at issue in this Adversary Proceeding, and two issues must be addressed in determining the Motion for Protection.

First issue: Are the [transaction] documents ambiguous? If the documents are unambiguous, then parole evidence may not be used to determine or alter the terms of the transactional documents.

Second issue is whether the Parole Evidence Rule governs statements and documents that do not constitute terms of the documents.

I'll just repeat the second issue because I think it's the more complicated one.

And that is, whether the Parole Evidence Rule governs statements in documents if the statements that are in the documents do not constitute terms of the documents.

The Court now holds as follows: One, Terms: if you will, the capital T terms, are provisions that identify the structure and the various rights and obligations of the parties.

In this particular instance Terms include, but are not limited to, the calculation of the total amount that is to be paid by ATP to Diamond.

Second, the calculation of the amount of the periodic payments due to Diamond, including the fact that the calculation relies on the production of hydrocarbons or the determination of the amount of the periodic payments.

Third, the dates on which the payments are due.

Fourth, Diamond's rights following a breach by ATP of its obligations under the agreements.

Fifth, the choice of law provisions; although the choice of law provisions may not bind the Court or third parties.

. . . [T]he Court holds that the Terms of the documents are not ambiguous. . . .

But what I'm holding, in terms of finding that the Terms aren't ambiguous is, I can tell with precision what's due, when it's due, how you measure it, what expenses are charged against it. All of the things that are the business Terms of the document I think are unambiguous.

Number three: Discovery, therefore, is not allowed, and I will protect Diamond against discovery if the sole purpose of the discovery is to vary the transactional Terms.

Number four: Mere statements in the documents are not Terms, Terms with a capital T. These statements may be warrants by one party to another, the statements may even serve as evidence for estoppel purposes, but the statements are not Terms that are governed by the Parole Evidence Rule. Statements in the documents include characterizations of the transaction's nature, as well as implicit or explicit expressions -- implicit or explicit expressions of subjective intent.

. . . .

. . . The Parole Evidence Rules does not govern the Court's interpretation or application of the characterizations in a document. That is, statements are not Terms.

Number five: The Court must look at the economic substance of the transaction's Terms in order to determine its true nature. In particular, we must determine in this case -- and the following is intended to be a shorthand for the dispute, it's not intended to limit it -- whether the transactional documents implement a deferred payment arrangement --

. . .

We must determine whether the transactional documents in this case implement a deferred payment arrangement or a transfer of hydrocarbons under applicable non-bankruptcy law. Therefore, discovery is allowed if the purpose of the discovery is to learn or lead to evidence having any tendency to make the issue of whether the transactional documents implement a deferred payment arrangement, or whether the transactional documents implement a present transfer of hydrocarbons either more or less likely.

(Case No. 12-3425, ECF No. 122 at 11-14).  This oral ruling resulted in an order granting in part and denying in part Diamond's motion for a protective order.   (Case No. 12-3425, ECF No. 120).

Examples were discussed to better define the contours of the ruling.  Certain examples (e.g., characterizations or statements of intent) were specifically identified as not constituting "Terms"—and therefore not binding upon the Court.  Other contract details presented more nuanced situations.  One example is the $20,000 "financing premium"[2]:

As to what this one is, is what I think the fight is about and the fact that it may have – I think [the interest at issue] certainly has some of the

---

[2] If ATP chose to pay Diamond's day rate (originally set at $540,000) via the separate payment structure set up by these transactions (allowing for deferred payment), ATP would pay $560,000 instead of $540,000.

characteristics of an ORRI, we know that. And it certainly has some characteristics of a deferred financing transaction. I think we know that because the amount that needs to be paid is more to pay it over time than if it were paid in cash up front.

Now, as to whether that's sufficient, I don't know as to how that – the pay rate, as I read it, was $20,000 a day higher if it was going to pour into the ORRI than if it was going to be paid in cash. I don't know where that 20,000 comes from.

And this is probably a good example of the kind of discovery that I am anticipating. I'm not anticipating any discovery and won't allow discovery to say there isn't a $20,000 premium for financing it. I think that's an unambiguous Term. But it's fair game to figure out why there's a $20,000 premium for financing.

(Case No. 12-3425, ECF No. 122 at 22-23).

ATP may not conduct discovery to support an argument that, although the contract unambiguously sets forth a $20,000 financing premium, the parties intended the financing premium to be $15,000. This would be an attempt to use extrinsic evidence to contradict an unambiguous "Term." Other evidence related to the $20,000 financing premium might be discoverable. ATP may discover information related to the $20,000 financing premium in support of its argument that the economic substance of this transaction differs from its characterization.

Diamond filed an emergency motion for reconsideration the rulings. (Case No. 12-3425, ECF No. 124). The motion was considered on April 4, 2013.

### b.  April 4, 2013 Hearing (p.m.)

Diamond's motion for reconsideration argued that the distinction between "terms" and "Terms" was not supported by Louisiana law. (*Id.* at 3) ("[C]ourts are required to harmonize all language utilized in a contract to give effect to the intent of the parties without reference to extrinsic evidence. Case law does not distinguish between 'terms,' 'Terms,' 'phrases,'

'provisions' or 'statements' in a contract."). Diamond argued that courts are equally bound by unambiguous characterizations and statements/recitals of intent as they are by unambiguous provisions such as "X is to pay Y $50 every Friday" (i.e., a "Term"). A similar question of law was raised at a hearing in the TM adversary proceeding that same morning.

The motion for reconsideration was not ruled upon at the April 4, 2013 hearing. The Court requested that Diamond and ATP brief two issues.

The first issue related to how Diamond's assertion (i.e., no difference between "terms" and "Terms" recognized under Louisiana law) could be true given that Louisiana law allows for recharacterization in the true sale/lease cases:

> [W]hether, in a true sale situation, how are the Courts ignoring, and I don't mean that pejoratively, but ignoring the stated characterization of the document as a true lease, to then determine that true leases aren't true leases but are financing arrangements when the documents say they're true leases.
>
> And at least my experience on this . . . is they normally go – there's like this big paragraph that says, "We don't care what anybody says, this is really a lease." Right? And they sort of go on and on about how it's really a lease. And then the Court will come in saying, "No, it's not."
>
> And I want to know how Courts get to that when they – if you're correct about really what the term "Terms" means as we explained at the last hearing. So I need that brief.

(Case No. 12-3425, ECF No. 128 at 71-72). The second issue centered on what to do if certain terms are equally consistent with a loan (i.e., a "disguised financing" transaction)[3] or a conveyance of a real property interest:

> The second issue is, as I expressed this morning in the TM case, I have the same concern here, which is if there are terms that are equally consistent with either a loan or an ORRI, that's going to certainly influence the way

---

[3] This phrase, often used throughout this adversary proceeding, may not be particularly apt. Entities finance themselves through sales of real property interests as well as with loans. In these proceedings, the Court uses the word "disguised" to mean an interest characterized as a sale but with the economic substance of a loan.

we look at this. It just has to, as opposed to having a term that would only be consistent with a loan.

(Case No. 12-3425, ECF No. 128 at 72).

The parties briefed these issues in connection with the April 22, 2013 hearing.

## II. Prior Rulings in the TM Adversary Proceeding

In contrast to the Diamond adversary proceeding, discovery in the TM adversary proceeding was completed prior to the April hearings.  TM and ATP had previously filed competing motions for summary judgment.  (Case No. 12-3429, ECF Nos. 93-94).  A dispute exists as to whether extrinsic evidence should be considered in connection with those motions for summary judgment.

### a.  April 4 Hearing (a.m.)

The April 4 hearing in the TM adversary proceeding was set on TM's Motion to Exclude Evidence and ATP's Motion to Strike. (Case No. 12-3429, ECF Nos. 105, 117).  The hearing focused on TM's Motion to Exclude Evidence.  (Case No. 12-3429, ECF No. 128 at 4).

TM's Motion to Exclude Evidence sought to preclude the consideration of evidence used by ATP in connection with its response to TM's first summary judgment motion.  As an example, TM sought to exclude expert reports addressing the transactions' economic substance. (Case No. 12-3419, ECF No. 105 at 3-4).

TM argued "that the Court can't go outside the four corners for interpreting the contract and determine the common intent of the parties."  (Case No. 12-3429, ECF No. 128 at 4).  This is similar to Diamond's argument that characterizations or statements of intent ("This is a sale" or "The parties intend for this to be sale", i.e., "terms") are subject to the parol evidence rule in the same manner as provisions such as "X must pay Y $50 every Friday" (a "Term").  TM distinguished the true sale/lease cases by arguing that the issue of intent in all of those cases was

disputed or ambiguous.  Here, the contracts unambiguously state that the parties intended to enter into a real property transaction.[4]

The Court found that the outcome of the motion to exclude hinged on the (disputed) legal issue of whether (when faced with an economic substance/recharacterization scenario) courts are in fact bound by unambiguous characterizations and statements of intent contained in a contract:

> **The Court**:  Yeah, look, I think [the admission and consideration of extrinsic evidence] all depends, though on whether the parties' original characterization intent is binding or whether we can leave it, so.

> **Mr. Knull [ATP's counsel]**:  We agree with that, but the Louisiana cases say they're not.

> **The Court**:  Well, except that I think you're telling me that Louisiana cases say you look at the economic substance of it. But he's telling me there's an exception to that if you don't dispute the original intent of the parties from a legal point of view.

(Case No. 12-3429, ECF No. 128 at 65).  TM and ATP were to brief the issue in advance of the April 22, 2013 hearing.

This issue was at the forefront of both proceedings, although for somewhat different reasons.  The Diamond adversary presented the question of whether to allow discovery of extrinsic evidence, while the TM adversary presented the question of whether extrinsic evidence (once obtained) could be considered.

**III. The *Howard Trucking* Cases**

The Court's rulings (at the April 22 hearing and the prior hearings) were based primarily on its reading of the two *Howard Trucking* cases.

---

[4] TM also argued that the evidence should be excluded because ATP has judicially admitted the intent of the parties and cannot offer evidence to contradict its admissions.  (Case No. 12-3429, ECF No. 128 at 4).  The Court rejected this argument at the April 4 hearing.

The Louisiana appellate *Howard Trucking* decision, affirmed the lower court's holding that, as a matter of law, the contracts entered into between the parties were "thinly disguised conditional sales", despite the fact that they were structured and characterized as leases.  474 So. 2d 955 (La. App. 5 Cir. 1985).  The lower court had not held a trial.  Howard Trucking (the plaintiff) appealed the trial court's decision to grant the defendant's motion for summary judgment.

The Louisiana appellate court ruled that (in a recharacterization/economic substance scenario) courts are not bound by characterizations (e.g., "This is a lease").  The documents at issue were both characterized and structured as leases.  474 So.2d at 959 ("The plaintiff points out that the contract forms were entitled 'lease'; they were structured as leases in accordance with the request of John Stassi, who was the president of Orleans-Iberia, Inc., and the tax attorney and a shareholder of that corporation.").  The Louisiana appellate court noted that:

> It is well-established that we are not bound by the label placed on a written agreement or the subjective intent of the contracting parties, but must look to the substance of the transaction in determining rights and obligations. Words will have import and can be binding only when they describe relationships which actually exist, but not when they are merely labels which are used to alter or disguise actual relationships.

*Id.* at 960 (citing *Pastorek v. Lanier Sys. Co.*, 249 So.2d 224 (La. App. 4th Cir. 1971)).

The question of intent is less clear.  Howard Trucking contended that summary judgment should not have been granted because a genuine issue of fact remained as to the parties' intent— an issue Howard Trucking believed was material in a recharacterization scenario.  *Id.* at 959 ("The material fact at issue was the intent of the parties in making the contract, whether they intended the contract to be a lease or a sale.").  Howard Trucking submitted affidavits in support of the argument that the parties intended to enter into a leasing arrangement.  The appellate court

affirmed the trial court's decision that the affidavits failed to establish a genuine issue of material fact:

> The affidavits submitted by the plaintiff merely allege that John Stassi wanted to call the contracts between the plaintiff and Orleans-Iberia leases for tax purposes and that Stassi supplied the printed lease forms which were signed by the parties. These facts were not contested by any party to the lawsuit and do not, in any event, bear upon the holding of the trial court. Therefore, from the record facts, we find the trial court did not err in determining there was no genuine issue of material fact for trial.

*Id.* at 959.  This excerpt has two possible interpretations.

The first possible interpretation is that the affidavits did not even constitute evidence of the parties' intent to enter into a lease agreement, instead merely showing that one party wanted to call the transaction a lease for tax purposes (and that the parties used printed lease forms). This interpretation is bolstered by the phrase "[t]he affidavits submitted . . . merely allege that John Stassi wanted to call the contracts . . . leases for tax purposes."

The second possible interpretation is that the appellate court did not consider the parties' intent material in a recharacterization/economic substance scenario. This interpretation is bolstered by the phrase "[t]hese facts . . . do not . . . bear upon the holding of the trial court."

The Louisiana Supreme Court framed the intent issue presented in the case as follows: "Howard Trucking contends that because the parties intended the agreements to be leases they are leases in law.  It is true the intent of the parties to a contract should govern its interpretation. *Pastorek* . . . on which the lower courts relied, is not to the contrary." *Howard Trucking Co. v. Stassi*, 485 So.2d 915 (La. 1986).  The Supreme Court then ruled that, despite the evidence put forth as to intent, Howard Trucking still failed to establish the existence of a genuine issue of material fact:

> The record shows that the parties treated the contracts in the present case as leases for some purposes and as sales for other purposes. That they

> were designated and treated as leases for federal tax purposes is insufficient to defeat the motion for summary judgment. *Rather, the best evidence of the parties' intent is what the parties agreed to do.*

*Id.* at 918 (emphasis added). The Supreme Court then enumerated the contracts' "Terms." (*Id.*) ("Orleans-Iberia agreed to make a down payment of $275,000 and to make forty-six monthly payments of $3489.42, at 16.7% interest. The total of the payments equals the value of the equipment. The parties agreed upon a $100 option to purchase at the end of the term. Orleans-Iberia was required to pay the full value of the equipment regardless of whether it exercised that option."). The implication is that, notwithstanding Howard Trucking's arguments that the parties intended to enter into a leasing arrangement, the economic substance of the transactions (i.e., what the parties agreed to) evidenced a different intent.

Whether intent is immaterial in a recharacterization/economic substance situation, or whether professed intent (even if unambiguous) may be contradicted by the economic substance of the transaction the parties agreed to, the result is the same.

### IV. The Combined April 22 Hearing

As noted above, important motions in both hearings hinged upon the issue of whether (when faced with an economic substance/recharacterization scenario) courts are in fact bound by unambiguous characterizations and statements of intent contained in a contract.

The Court ruled that it is not so bound in a recharacterization scenario:

> I'm overruling the argument that we're restricted to the four corners of the document when we are in a substance over form lawsuit because we need to determine from outside of the document what, in this case, a term ORRI is so that we can then look at the four corners of the document to determine if it's consistent with the term ORRI.

(Case No. 12-3425, ECF No. 138 at 27).

The Court made a separate ruling at the hearing that might render consideration of such evidence unnecessary—by giving TM and Diamond the opportunity to show that Louisiana law would clearly not allow recharacterization.  At the beginning of the hearing, the Court stated:

> I want to divide the discovery dispute into two parts. One is whether the agreements in either the Diamond or the TM cases are consistent in all ways with Louisiana law as surrogate federal law on the transfer of a real property interest, which is the declared intent within the documents, or if there are any inconsistences between the documents and applicable law, being Louisiana law is a surrogate for Federal law unless it is inconsistent with Federal law.  And if – at the point when that discovery ends, that we then do a Summary judgment on that question.
>
> I have a difficult time believing, having read your briefing and having read the cases, that if the documents are always consistent with an ORRI or an NPI – and I must say also within themselves because I know there's one argument that says the documents have internal inconsistency because this really is a farmout agreement and so how could it possibly be consistent with Louisiana law on that? But I have a hard time believe that if everything is consistent, the Louisiana law would allow any re-characterization.
>
> And so to allow discovery solely on that question and then do a Summary Judgment solely on that question, one way or the other, if it turns out that we rule on Summary Judgment that everything is consistent with the stated intent. I think that'll be game, set and match for the Plaintiffs.
>
> On the other hand, if we were to rule that there are provisions that are not always consistent with a term ORRI under the applicable law, then we would go ahead and open discovery into what I'll call the second issue, which would be accounting discovery issues.[5]

(Case No. 12-3425, ECF No. 138 at 5-6).  The ruling implicit in the road map was later restated in the following manner:

> I'm going to go back to the beginning, which is I'm not getting an ambiguous statement to me as to what Louisiana law is and I am therefore determining that under Louisiana law that if you have a document that

---

[5] Accounting records were one of the items ATP sought to discover.  This ruling is not limited to the accounting records

isn't [in]consistent with what it purports to be, that we don't then look behind it. Putting the burden on [ATP] to find inconsistency.

And I know you think that shouldn't be what the law is, but I think that is what the law is in Louisiana. I don't think there's another way to read it. Because I'm not finding a single recharacterization case where in the end they didn't say there was some inconsistency with the self-characterization.

That inconsistency can be economic; that inconsistency can be legal; it can take a lot of forms. But unless you produce something that shows me an actual or potential inconsistency, in other words, disputed inconsistency, from a factual point of view, then I think they win.

(Case No. 12-3425, ECF No. 138 at 34).

The $20,000 financing premium from the Diamond transactions provides a good example to illustrate this point.

In accordance with this Court's ruling that it is not bound by characterizations or statements of intent, extrinsic evidence is discoverable and admissible—as long as it does not seek to alter an unambiguous contract "Term."   Assuming the economic substance of this transaction is disputed, certain extrinsic evidence related to the $20,000.00 financing premium might be relevant to a recharacterization analysis.   ATP would be allowed to discover emails or accounting records, in an attempt to show how the parties derived this $20,000.00 figure.

Yet, if recharacterization were not an available theory for ATP, then consideration of this evidence would be unnecessary.

If Louisiana law recognizes interests with these characteristics as real property, then so must this Court—notwithstanding expert testimony that these interests are economically inconsistent with real property.[6]   If transactions with these characteristics are unquestionably consistent with real property interests under Louisiana law, in addition to being characterized as

---

[6] This assumes no inconsistency between Louisiana and federal law.

such by parties whose unambiguously stated intent was to enter into real property transactions, recharacterization under Louisiana law would not be a viable theory.

Both TM and Diamond filed motions for summary judgment as a result of this ruling.

At the hearing, the Court indicated that the burden of demonstrating inconsistency belonged to ATP. ATP has the ultimate burden as to its recharacterization argument. ATP's theory is that these transactions are, in terms of economic substance, inconsistent with conveyances of real property interests and should be recharacterized as a debt instrument. ATP need not prove this at summary judgment stage.

ATP must demonstrate at this summary judgment stage, that recharacterization is a viable theory.[7] The transaction documents unambiguously characterize the transactions as conveyances of real property interests. The transaction documents unambiguously state that the parties' intent is to convey real property interests. TM and Diamond moved for summary judgment in their respective adversary proceedings, arguing that these interests are in all ways consistent with ORRIs and NPIs under applicable law (here, Louisiana as surrogate federal law). If TM and Diamond are correct, recharacterization under Louisiana law would not be allowed. In that situation, TM and Diamond would be entitled to summary judgment, and the extrinsic evidence at issue in these disputes (while relevant and admissible to support a recharacterization theory, would not be considered).[8]

---

[7] TM and Diamond put forth other arguments as to why recharacterization theory is not a viable theory, which must eventually be addressed. The question here is, even assuming recharacterization would be an otherwise viable argument, whether these interests are so clearly consistent with Louisiana real property law that allowing ATP to conduct discovery on this issue (in the Diamond adversary) or present extrinsic evidence only admissible under a recharacterization theory (in the TM adversary) would be inappropriate.

[8] This would still be subject to the argument that Louisiana law (by defining interests with such characteristics as real property interests) would be inconsistent with federal law. If so, federal law would apply and recharacterization might again be applicable.

The question is whether the Court can determine, at this point, whether the interests in these adversary proceedings are undoubtedly consistent with Louisiana real property law.

## Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Fed. R. Bankr. P. 7056 incorporates Rule 56 in adversary proceedings.

A party seeking summary judgment must demonstrate: (i) an absence of evidence to support the non-moving party's claims or (ii) an absence of a genuine dispute of material fact. *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009); *Warfield v. Byron*, 436 F.3d 551, 557 (5th Cir. 2006). A genuine dispute of material fact is one that could affect the outcome of the action or allow a reasonable fact finder to find in favor of the non-moving party. *Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Cir. 2008).

A court views the facts and evidence in the light most favorable to the non-moving party at all times. *Campo v. Allstate Ins. Co.*, 562 F.3d 751, 754 (5th Cir. 2009). Nevertheless, the Court is not obligated to search the record for the non-moving party's evidence. *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003). A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record, showing that the materials cited do not establish the absence or presence of a genuine dispute, or showing that an adverse party cannot produce admissible evidence to support the fact.[9] Fed. R. Civ. P. 56(c)(1). The Court need consider only the cited materials, but it may consider other materials in the record. Fed. R. Civ. P. 56(c)(3). The Court should not weigh the

---

[9] If a party fails to support an assertion or to address another party's assertion as required by Rule 56(c), the Court may (1) give an opportunity to properly support or address the fact; (2) consider the fact undisputed for purposes of the motion; (3) grant summary judgment if, taking the undisputed facts into account, the movant is entitled to it; or (4) issue any other appropriate order. Fed. R. Civ. P. 56(e).

evidence.  A credibility determination may not be part of the summary judgment analysis. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007).  However, a party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.  Fed. R. Civ. P. 56(c)(2).

"The moving party bears the burden of establishing that there are no genuine issues of material fact."  *Norwegian Bulk Transp. A/S v. Int'l Marine Terminals P'ship*, 520 F.3d 409, 412 (5th Cir. 2008).  The evidentiary support needed to meet the initial summary judgment burden depends on whether the movant bears the ultimate burden of proof at trial.

If the movant bears the burden of proof on an issue, a successful motion must present evidence that would entitle the movant to judgment at trial.  *Malacara*, 353 F.3d at 403.  Upon an adequate showing, the burden shifts to the non-moving party to establish a genuine dispute of material fact.  *Sossamon*, 560 F.3d at 326.  The non-moving party must cite to specific evidence demonstrating a genuine dispute.  Fed. R. Civ. P. 56(c)(1); *Celotex Corp. v. Cattrett*, 477 U.S. 317, 324 (1986).  The non-moving party must also "articulate the manner in which that evidence supports that party's claim."  *Johnson v. Deep E. Tex. Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 301 (5th Cir. 2004).  Even if the movant meets the initial burden, the motion should be granted only if the non-movant cannot show a genuine dispute of material fact.

If the non-movant bears the burden of proof of an issue, the movant must show the absence of sufficient evidence to support an essential element of the non-movant's claim.  *Norwegian Bulk Transp. A/S*, 520 F.3d at 412.  Upon an adequate showing of insufficient evidence, the non-movant must respond with sufficient evidence to support the challenged element of its case.  *Celotex*, 477 U.S. at 324.  The motion should be granted only if the non-

movant cannot produce evidence to support an essential element of its claim.  *Condrey v. Suntrust Bank of Ga.*, 431 F.3d 191, 197 (5th Cir. 2005).

<u>Analysis</u>

**I.   The TM Adversary Proceeding**

  **a.   TM's Second Motion for Summary Judgment**

  TM's Second Motion for Summary Judgment does not supersede its previously filed motion for summary judgment. It addresses the issue of inconsistency, as the Court requested. ATP responded to TM's motion but did not file its own summary judgment motion.

  **b.   Economic Substance**

  The Court finds there is a genuine issue of fact as to the economic substance of these transactions.

  ATP submitted a report produced by its expert, Dr. Scott T. Jones.  (Case No. 12-3429, ECF No. 102-8 at 1).   Dr. Jones concluded the transactions at issue in the TM adversary proceeding were, in terms of economic substance and form, inconsistent with conveyances of real property interests.  (Case No. 12-3429, ECF No. 102-8 at 9) ("It is my professional opinion based on the applicable economics and my professional experience that the conveyances to Plaintiffs of the term ORRIs and the term NPI in [these transactions] represented a form of [debt] financing rather than the conveyance of real property.").[10]

_____

[10] TM pointed out that "financing" is not limited to loans or other debt instruments and that an entity may choose to finance itself by the sale of real property interests.  This is true.  However, it is clear from the report that Dr. Jones is examining whether these interests are more akin to real property interest or a debt instrument.  (Case No. 12-3429, ECF No. 102-8 at 7) ("I have been asked to assess . . . whether the term ORRIs and NPIs . . . assigned to Plaintiffs . . . were in economic form and substance a conveyance of real property from ATP to Plaintiffs or represented a financing transaction (i.e., a loan).").

TM's expert, C. John Thompson, also submitted a report.[11]  Thompson disagrees with Dr. Jones on the question of economic substance.  (Case No. 12-3429, ECF No. 130-30 at 3) ("I have concluded each and every characteristic of [these transactions], identified by [ATP] as those of a financing transaction and not a true sale of a property interest, are customary and consistent within the Industry with the characteristics of a sale of a property interest or ORRI.") (emphasis omitted).

The competing expert reports address economic substance and industry custom, not whether Louisiana law would nevertheless recognize interests with these characteristics as real property interests.

Louisiana may choose to recognize interests of any kind as real property interests—even interests which, under the laws of any other state, would not be considered real property.  If Louisiana law recognizes these interests as real property interests, so will this Court.[12]  If TM or Diamond can demonstrate that Louisiana law would consider the ORRIs and NPIs as real property interests, then they are entitled to summary judgment—notwithstanding Dr. Jones's opinion as to the economic substance of these transactions.[13]

---

[11] The Court has not considered the rebuttal reports.

[12] Louisiana law only applies to the extent not inconsistent with federal law, so there is the additional issue of whether it would be inconsistent with federal law for Louisiana law to recognize certain interests as real property interests.  43 U.S.C. § 1333(a)(2)(A); *Cutting Underwater Techs. USA, Inc. v. Eni U.S. Operating Co.*, 671 F.3d 512 (5th Cir. 2012) (per curiam).

[13] To be clear, TM and Diamond would be entitled to summary judgment as to whether Louisiana law would allow for these interests to be recharacterized.  If it were determined that Louisiana law, by recognizing these interests as real property, is inconsistent with federal law, this would present the issue of whether federal law would allow recharacterization.

c.   **Allegedly Inconsistent Characteristics**

ATP's response to TM's Motion for Summary Judgment highlighted the characteristics it believes renders these interests inconsistent with what Louisiana law recognizes as real property interests.

Several aspects were combined under the heading of "effective recourse": (i) conditional increases in distribution and royalty percentages;[14] (ii) use of a Designated IRR and cash-on-cash hurdles;[15] (iii) "cross-collateralization"; and, (iv) certain aspects of the payment structure[16] in the GMZ transactions. (Case No. 12-3429, ECF No. 167 at 20-26).

ATP separately categorized three additional aspects: (i) accrual of "interest" during a period between when production payment sold and when hydrocarbon production began at

---

[14] For some of the transactions, royalty percentages increased if ATP failed to reach certain milestones by a given date.  (*See, e.g.*, Case No. 12-3429, ECF No. 93-3 at 21).

[15] Designated IRR means a designated internal rate of return.  In connection with these transactions, a Designated IRR (of 15%, for example) meant that the interests transferred do not terminate until the purchaser receives production payments equaling at least the purchase price paid plus a 15% rate of return on the purchase price.  (*See, e.g.*, Case No. 12-3429, ECF No. 93-3 at 11). In connection with these transactions, a cash-on-cash hurdle (say of 1.2x) means that an interest would not terminate until the purchaser received in production payments an amount totaling at least 120% of the interest's purchase price.

[16] ATP's objection is that the payment mechanism might result in ATP paying cash out of pocket to make up a shortfall:

> In the GMZ transactions, the payment mechanism in the Collateral Agency Agreement and Covenant Agreement further puts ATP's own funds at risk, because ATP must direct the purchasers of hydrocarbons produced by the property subject to GMZ Energy's interests to pay to the Collateral and Payment Agent 34% of the total proceeds payable to ATP. This 34% figures *exceeds* the Applicable Royalty Percentage payable to GMZ Energy out of the Subject Interests (in the case of some wells, by a considerable percentage) and thus includes some money of ATP. The Collateral Agent then calculates the amount that is payable to the Royalty Owners based on the Applicable Royalty Percentages. If the Applicable Royalty Percentage increases as described above, the amount payable to the Collateral and Payment Agent also increases. If insufficient funds have been paid into the collateral account in order to make the full Royalty Payment due to GMZ Energy, then ATP is required to make up the shortfall between the Royalty Payment due and the balance of the collateral account from its own funds.

(Case No. 12-3429, ECF No. 167 at 25-26).

related property; (ii) the GMZ Transactions had a protective mortgage;[17] and, (iii) "minimal risk of ownership."[18]

### d.  TM's Response

TM's motions addressed ATP's contentions.

TM cited Louisiana cases discussing an overriding royalty interest for which the amount of the interest varied according to production. *See Esso Std. Oil Co. v. Nesbit*, 63 So.2d 417 (La. 1953) (overriding royalty interest reduced from 3/16 to 1/8 depending on whether target of 100 barrels per month was achieved).   This arguably refutes ATP's allegation that conditional increases of royalty and distribution percentages renders these interests inconsistent with what Louisiana law would recognize as real property interests.   Unlike the present case, the alteration in production in *Esso* did not shift the production to an additional field.

Not all of ATP's contentions were rebutted.   Three key issues are: (i) the Designated IRR; (ii) the cash-on-cash hurdle; and, (iii) the cross-collateralization or diversification issue.

TM's expert's addressed the issue of the Designated IRR issue:

> The use of an *internal rate of return* ("*IRR*") is usual and customary in the Industry for the calculation of the *Purchase Price* or stated amount to be paid for any given *Term ORRI* or *NPI ORRI*. This is the rate of return the capital projects they need to earn, based on the perceived risk for any given transaction. The higher the perceived risk, the higher the *IRR* used to calculate the *Purchase Price* for the *ORRI*.  This Industry practice would be consistent with these *GMZ Term ORRI Conveyances*, *CLP Term ORRI Conveyance*, and the *TM Term Conveyance*, where the stated amount or *Purchase Price* is calculated by projecting the cash flow stream for the *ORRI* from the production and sale of the hydrocarbons from the

---

[17] The GMZ Transactions contained a security agreement granting a security interest (to secure a portion of the amount owed by ATP) that would take effect in the event a court found the interests did not constitute real property interests.  (Case No. 12-3429, ECF No. 93-7 at 4).

[18] ATP argued that the structure of these transactions insulated TM from risks associated with ownership (e.g., a precipitous drop in the price of oil). (Case No. 12-3429, ECF No. 167 at 23-27). As noted above, TM's interest continued until the Designated IRR and cash-on-cash hurdle were achieved.  If the price of oil dropped, it would simply take a greater amount of production to terminate TM's interest.

> associated assets or leases and discounting such cash flow stream to *Present Value* based on the associated *IRR*.

(Case No. 12-3429, ECF No. 150-30 at 5).  This does not describe what occurred here.

The parties agree that IRR calculations are a common methodology used for both loans and real property conveyances.  However, in a typical purchase, a purchaser would calculate its internal rate of return to determine how much it would pay.  The purchaser would then take the risk of performance.   In these transactions, the putative seller (ATP) took the risk of performance.  As noted by Dr. Jones, these transactions made ATP responsible for[19] assuring that TM achieved its Designated IRR:

> There is no analytical difference between a financing agreement that calls for a 21% rate of interest to be paid on some principal amount (e.g., $10) and an agreement, such as the term transactions at issue in this proceeding, that calls for future cash flows to be discounted at a rate of 21% such that present value of those future cash flows equals the same principal amount (i.e., $10). The discount factor – what [TM's expert C. John Thompson] refers to as the IRR and what the term transactions define as the "Designated IRR" – is analytically equivalent to a rate of interest paid by the borrower. . . .

> Rather a fundamental economic difference concerns the obligations of the parties as related to the IRR. While a buyer of an asset may employ a discount factor, such as an IRR, in its determination of the value of the asset – and, hence, the price it is willing to pay for the asset – the seller has no obligation to ensure that the buyer achieves the expected rate of return. . . .

> The IRR as employed in the term transaction at issue in this proceeding is, in contrast, a specified rate of return. ATP is, as seller of the term transactions, obligated to remit to Plaintiffs,as buyer of the term transactions, future cash flows encompassing a defined return and principal repayments in exchange for the principal amounts of capital Plaintiffs provided to ATP.

(Case No. 12-3429, ECF No. 102-8 at 76-77).

---

[19] By "responsible for," the Court means that as long as ATP retained rights in any lease burdened by this interest (and oil was still being produced),  TM's interest would not terminate until ATP had paid TM an amount sufficient to cover the interest's purchase price plus the Designated IRR (an amount constantly increasing with  time).

TM's reply to ATP's response did not address the cash-on-cash hurdle issue except to argue that ATP failed to provide support for their argument that a cash-on-cash hurdle would be inconsistent with term overriding royalty interests under Louisiana law.  (Case No. 12-3429, ECF No. 168 at 9).

As to the cross-collateralization issue, TM discussed Louisiana cases where an overriding royalty interest entitled the holder to production from any well on a given property.  *Esso Std. Oil Co.*, 63 So.2d at 417.  This is, again, different from the present situation.

In these adversary proceedings, interests were sold that burdened various OCS leases, sometimes at multiple hubs (e.g., an interest burdening not only various OCS leases, but also burdening both the Gomez and Telemark hubs).  If ATP lost rights in any of the OCS leases, the amount owed to the purchaser would not be proportionately reduced.  ATP would still be required to pay the same amount before the interests would terminate, although production payments from a reduced number of leases would be left to reach this amount.  In other words, TM's rights to specific production payments (e.g., 21% royalty percentage as to MC 754) relates only to particular piece of real property (MC 754), but the right to receive a stream of production payments totaling the purchase price (plus the Designated IRR, etc.) burdened multiple leases. This arrangement can be properly described as a joint and several obligation linked to various leases.

The TM adversary proceeding presents an additional variant of the "cross-collateralization" issue.  At least one transaction created a production payment that began to provide material returns only if other planned production payments failed to materialize within a specified time.  (Case No. 12-3429, ECF No. 93-17 at 27-28) (interests in certain Telemark

Wells increased from a 0.0005% distribution percentage to a 100% distribution percentage until Clipper qualifies as a successful well, if such had not occurred prior to a specified date).

This, again, is quite a different situation from the cases cited by TM.

### e. Result

The evidence before the Court indicates a genuine issue of material fact as to the economic substance of these transactions.  Although some of the Terms in the TM documents are consistent with Louisiana law, there is no Louisiana authority that supports the proposition that a transaction that contains *all* of the Terms in the TM documents are consistent with a transfer of a Louisiana real property interest.

The Court will not examine each Term in isolation.  Rather, to determine whether there should be recharacterization, the Court will examine the transactions as whole and integrated.

The Court is unable to determine that the TM transactions are real property transactions as a matter of law. TM's Second Motion for Summary Judgment must be denied. TM's Motion to Exclude Evidence must similarly be denied.[20]

## II.  The Diamond Adversary Proceeding

### a.  Diamond's Motion for Summary Judgment

Diamond's Motion for Summary Judgment: (i)  argues that the parol evidence rule applies to characterizations and statements of intent  when a contract is unambiguous; (ii) argues that its transactions documents (the conveyance and the farmout agreement) are consistent with the creation of an incorporeal immovable under Louisiana law; (iii) discusses how these interests are inconsistent with a loan secured by receivables.  (Case No. 12-3425, ECF No. 144).

---

[20] If the Court ultimately determines that Louisiana law would not allow recharacterization, and that Louisiana law is not inconsistent with federal law, then the extrinsic evidence will not be considered.

At this stage, the issue is is whether, even assuming the Court's *Howard Trucking* rulings are correct, recharacterization under Louisiana law is clearly not a viable theory for ATP (and the Court should not allow discovery on, or consider, extrinsic evidence in connection with a recharacterization argument).

### b.  Economic Substance

ATP submitted an export report, also prepared by Dr. Jones, addressing the economic substance of the Diamond transactions.  As with the TM transactions, Dr. Jones concluded that the Diamond transactions are economically inconsistent with a real property transfer.  (Case No. 12-3425, ECF No. 153-20 at 8) ("It is my professional opinion based on the evidence presented in this proceeding, the applicable economics, and my professional experience that the transaction, i.e., the conveyance to Diamond of the term-limited ORRI/NPI in the Subject Interests, represented a form of financing rather than the conveyance of real property.").

The Court finds there is a genuine issue of fact as to the economic substance of these transactions.

As noted above, Louisiana may choose to recognize interests of any kind as real property interests—even interests which, under the laws of any other state, would not be considered real property.  If Louisiana law recognizes these interests as real property interests, so will this Court.[21]   If Diamond can demonstrate that Louisiana law would consider as real property interests with these characteristics, then they are entitled to summary judgment—notwithstanding Dr. Jones's opinion as to the economic substance of these transactions.

---

[21] Louisiana law only applies to the extent not inconsistent with federal law, so there is the additional issue of whether it would be inconsistent with federal law for Louisiana law to recognize certain interests as real property interests.  43 U.S.C. § 1333(a)(2)(A); *Cutting Underwater Techs. USA, Inc. v. Eni U.S. Operating Co.*, 671 F.3d 512 (5th Cir. 2012) (per curiam).

###### c. Allegedly Inconsistent Characteristics

ATP's response to Diamond's motion identified those aspects of the interest that make it such that Louisiana law would not recognize it as a real property interest.  (Case No. 12-3245, ECF No. 152 at 27).  The Court analyzes two of those issues.

ATP argues that the Court should read the Farmout Agreement and the ORRI/NPI interests together in order to determine the true nature of the transaction.  Under the amended[22] Farmout Agreement, ATP was required to pay a 7.5% return to Diamond calculated against the outstanding remaining balance in the ORRI account.  ATP's obligation to pay the 7.5% additional return was not limited by or payable from production.  Rather, it was an unconditional cash obligation measured against the ORRI.

In its reply, Diamond alleges that it was permissible for the Farmout Agreement to have terms as contracted by the parties.  That misses the point.  The issue for the Court is twofold:

- Should the Farmout Agreement and the ORRI be read together?

- If so, is it consistent with a real property transfer to impose an unconditional payment obligation on the seller that is measured by the outstanding balance of the ORRI?

Without more, if the unconditional payment obligation and the purported real property transfers are read together, there may be an inconsistency with Louisiana law.

An additional possible inconsistency concerns the indeterminate nature of the interest ATP granted to Diamond:

> Here, however, Diamond's putative mineral interest is indeterminate, as it gives ATP the option of paying the excess over the Base Dayrate Charges for Shortfall Days in cash based on the discounted rate of $540,000 per Shortfall Day or of deferring payment and adding the obligation to the Contribution Amount at the rate of $560,000 per Shortfall Day.  These provisions leave the scope of the purported mineral interest within the

---

[22]  The amended Farmout Agreement that contained this provision was executed after the original transactions.  This timing difference may ultimately be legally significant.

control of the grantor.  The option of payment of cash by the grantor that is unrelated to proceeds of production is also inconsistent with the basic definition of a mineral royalty interest under the Louisiana Mineral Code. Instead, it is squarely consistent with a loan.

(Case No. 12-3425, ECF No. 152 at 27) (internal citations omitted).

### d.  Diamond's Response

Diamond's Motion for Summary Judgment set forth its argument that these interests have the necessary characteristics of overriding royalty interests (or net profit interests) under Louisiana law.  (Case No. 12-3425, ECF No. 143 at 35-40) (describing, for example, the interest as passive, free of drilling and production costs, and a share in hydrocarbons produced at the surface).[23]  Diamond similarly listed reasons why this interest is inconsistent with a loan secured by receivables.  (Case No. 12-3425, ECF No. 143 at 41-43) (noting the lack of a promissory note as well as a lack of a right to force payment in the event of a default).

Diamond might be correct that Louisiana law will recognize almost anything as an ORRI as long as it has the characteristics it outlined in its summary judgment motion.  It may also be correct that recharacterization should not occur where the interest has aspects that are inconsistent with how the interest is sought to be recharacterized.

However, neither the fact that this interest has characteristics inconsistent with a loan secured by receivables, nor the fact that this interests has characteristics consistent with an ORRI interest (as recognized by Louisiana law), is dispositive as to the narrow issue listed above.

In its reply, Diamond addressed ATP's argument:

ATP advances a logically flawed argument that the option to pay for Shortfall Days in cash conflicts with the definition in the Louisiana Minerals Code of an overriding royalty interest because overriding royalty interests are payable only out of the proceeds of production. As a purely

---

[23] Diamond set forth a similar argument as to the related Farmout Agreement.  (Case No. 12-3429, ECF No. 143 at 40-42).

> factual matter, even if the grantor could not bargain with the grantee of an
> overriding royalty interest to extinguish all or part of that interest with a
> cash payment—a conclusion that ATP does not support—the election to
> pay Shortfall Days in cash would not affect Diamond's interest. It is only
> if ATP elects to add these Shortfall Day charges to the amount collectable
> under the ORRI, that those amounts affect the ORRI. At that point,
> Diamond's only right to payment is through production. On the other
> hand, if ATP pays in cash, the dayrates owed for Shortfall Days are not
> added to the amount collectable under the ORRI.

(Case No. 12-3425, ECF No. 157 at 5).    The parties do not cite to applicable Louisiana law that determines whether the structure of this transaction—that gives the putative Seller the right to determine the amount that pours into the ORRI—creates a sufficient lack of certainty to be inconsistent with a Louisiana real property interest.

Diamond does, for the purposes of summary judgment, establish that the Diamond transaction has inconsistencies with a secured debt instrument.  However, that merely leaves the Court in a conundrum not answered by Louisiana law.  Assuming that ATP prevails on its argument that certain provisions of the transactional documents are inconsistent with a real property transfer,[24] the Court will be confronted with a transaction that is neither fish nor foul.  It is premature to grant summary judgment until the issue is resolved.

### e.  Result

There is a genuine issue of material as to the economic substance of these transactions. Notwithstanding that, had Diamond shown these interests are unquestionably consistent with what Louisiana law recognizes as real property interests, it would be entitled to summary judgment on the issue of whether Louisiana law would allow recharacterization.

---

[24]  In this opinion, we only hold that there is a material fact issue on inconsistency.

The Court is unable to determine that Louisiana law recognizes (as real property) interests with these characteristics. Diamond's Motion for Summary Judgment must be denied. Diamond's Motion for Protective Order must also be denied.

### Conclusion

The Court will enter separate orders in accordance with this Memorandum Opinion.

SIGNED **July 24, 2013.**

Marvin Isgur
UNITED STATES BANKRUPTCY JUDGE